Good morning. May it please the court, my name is Jim Van Ness. I'm representing the plaintiff appellant, Contreras Family Trust. I'd like to reserve three minutes of rebuttal. Okay, keep your eye on the clock. I will. While there's a couple of issues in this case, I believe the issue about the declarations has been argued ad nauseum in the briefs, so I'm going to spend my time on the contract itself. Insofar as that goes, within the excerpt of record, there's really five pages we need to look at, and that's the contract itself, which is on page 84. The contract was prepared by the defendant appellee. The Contreras Family Trust had nothing to do with its preparation. It was handed to them, they signed it, I believe October of 1992, but it wasn't actually given to them for about a year and a half later, March of 1994, with a letter that said a 30-day escrow will be opened. Now, why that's significant is the contract itself, if we look at it, it contains about 20 conditions, and on page 87 of the excerpt of record, the deed to the property, this is section B, it says within 30 days after acceptance of the contract for removal of the contingency, and I want to call the court's attention to that because there was a contingency, and much has been made about the 30 days, but there's been little said about the contingency, and that contingency is found, let's call it page 66, which is the face of the contract, and that contingency is found in paragraph 6. And this is that the- Sorry, what page were you on? Page 66. 66. And that contingency is found in paragraph 6, and it states that FMHA, the defendant appellee, will approve a credit sale for this property. Now, read together, we have to keep going back and forth, read together with paragraph B on page 69, it says when the credit sale is approved, then the purchaser will have 30 days. There's nothing in the record that ever states that the sale was approved, the financing was approved. Well, now, see, the only way that I see that you could create a tribal issue is there is, in this deposition, Eric testified that the family had presented the trust company with a cashier's check for $35,000, and he also testified that the Estro Company tried to contact FSA regarding the demand and never received a reply. Okay. Now, if there really was any evidence of this when you sort through all of this, you know, what, because you claim that, you know, that the arguments about having that, even though he doesn't appear to have personal knowledge, but because he was a trustee, then it's, but what real, what admissible evidence is there of that other than, I mean, obviously you just can't make something up. Right, but it cuts both ways. There's no evidence from either party that a demand was or was not received. So my position is that, yes, you're right, the Contreras Family Trust. But if there isn't any evidence of that, then it would, I mean. But there's no evidence that it was not received by FSA is what I'm saying. We have one. We don't have it. No one produced it. So what's, that seems like pretty good evidence. Well, but there was a lot of things that weren't produced at summary judgment. And that, again, is addressed in the brief that there were a number of documents during a four-year period that were left completely out of that. Well, what gives us a triable issue? What gives us a triable issue here? I mean, to me, it has to be in this area. Right. I guess I look at it a little broadly. I believe the fact that all of the duty rested with the defendant on this part, to create the notes, to create the deeds of trust, to give that demand to the title company. The title company cannot do anything unless the government produces all of these documents, which the contract puts that burden on them. That was never done. Except if you have a $35,000 check, you would be the one that would be able to show that. And there's no $35,000 check anywhere, right? That's correct.  I believe it was a cashier's check. Okay, so there's no check. So coming back to the statement made just before reference to the check, then what is it that the government, under the contract, had to put before the district court to shift the burden on to Conferra's Family Trust, such that the $35,000 check is posited one way or the other if you can't produce it? In other words, you seem to be saying that the evidence is in equipoise, and because the government has some contractual burdens, you at least get a prior fact to adjudicate beyond what the evidence is now in the record. And if, after going through that adjudication, there's still no $35,000 check and only hearsay testimony of Eric, that you would still win. So can you clarify where I'm missing the boat on this? For that duty to arise, to produce that $35,000 check under this contract, the seller had to notify the buyer that they had approved the credit sale. And it states right in the language of the contract that they, this is on page 70. In the paragraph that starts, applicable to credit sales, loans by FMHA only. Where are you? This is on page 70. And this is about halfway down in the paragraphs. It says applicable to credit sales, loans by FMHA only. That next paragraph, Q, for the credit sale to come into effect, it's like any other banking transaction. I'm walking into a bank asking for a loan. I'm going to give them my financials. That's what this says. The purchaser shall submit financial information upon request to the government within 30 days of such request. There's nothing in the record that shows that the government ever asked for these financials. Isn't there some record of a request for continuance by you? Yeah, and I'll get to that issue on a waiver if I may just finish on this point. The issue here is that until the government exercised its duty to ask for these financials and therefore approve the credit sale by the language of the contract and notify Contreras Family Trust that the credit sale had been approved, then Contreras Family Trust had no duty then to close an escrow. What are we closing? We haven't approved the credit yet. We have a letter from Mr. McIntyre that says if you're still interested, these are the rates and terms. He doesn't ask for the financials. On the other issue, which was an interesting issue, we have a period of about three months after this first letter from the defendant appellee which says 30-day escrow. We have letters that go back and forth asking for extensions. Now, Mr. McIntyre's declaration says as to the last request for extension, he noted it in his file that he had approved that whatever it was, another two-week extension, maybe six extensions, that he had approved yet another extension, but that was never conveyed to Contreras Family Trust. His declaration states, I noted it in my file. Well, on the note that he refers to, it doesn't say tell call P-C-6-10-94, something as two weeks okay, J-M. I thought he said he communicated that. I don't know who he communicated it to. It doesn't say who. That's just his initials, James McIntyre. He could have called his state office who were intimately involved in this. There's letters where he's doing that, asking assistance from his state office. There's a letter in 1996 from his state office telling him what their concerns are over this transaction, but there's nothing as to who he communicated that to. There's no evidence that he ever communicated it to Contreras Family Trust. So is the record then that there, in fact, was a request for information, that then they got caught up in this request for extension and then they never heard? That's your point? There was never any request by the seller. What's the requested extension? What does that relate to? That was the letter that was written, I want to say mid-June, that asked for yet another two-week extension to close the sale. That's just what that letter did. That was not in relation to paragraph Q? No, it was not. Any particular reason why a declaration was filed in opposition rather than an affidavit or a sworn statement? I was not the trial counsel. I can't answer that. I picked that up myself. I don't see it very often. No, you don't. That is a relatively new provision, 1746, allowing declarations, and is a good example of why you need to be cautious when you do that. It didn't conform. But on the waiver issue, California state law is real clear that once this waiver of this 30-day time period enters in, then the government, in this case the federal defendant, the seller, since they were the last ones to give or not give anything that would lead to any clear direction of what was happening with the sale, they had a duty then to make a demand. To contrary us to, hey, let's get this closed now. It's been long enough. We've had enough extensions. Enough time has gone past. And they probably should have also asked for the financials at that point. But the record is clear that they never did. I see I'm running out of time. Over time, actually. So I'll give you a minute on rebuttal. Thank you. Thank you. Good morning, Your Honor. Russell Chittenden of the U.S. Attorney's Office. I'm on behalf of the defendant here. Previously, the appellant has argued that my client failed to do two things to effectuate completion of this transaction. One is to submit what they call a demand. And the other is, well, the other is not so much in relation to my client, but they say they submitted a check which was never credited to them or returned or whatever. At any rate, that was their indication that they were prepared to proceed and to perform, and that, therefore, any failure to consummate the transaction was somehow the fault of my client. We've argued and we continue to argue that they're attempting to create a tribal issue of fact in retrospect because there's no contemporaneous documentation of any sort indicating that the Chicago title company, the escrow company or the trust itself or anyone else in writing ever requested that a demand be placed by my client into escrow. Well, okay, I'm having a little trouble sorting this out. There is a contract which sort of lays out the ground rules, okay, and what counsel is arguing that if you look at the contract, as I understand his argument, the ball was under the contract in your court as seller. So if there's an absence of information, where is it? And you can dispute that if that's the issue, but what's your response to the notion that the government as seller on the buyback deal here did not take the step or at least doesn't have documentary proof of it that it triggered the duty on the prospective purchaser to do what it needed to do? Apparently, counsel is, for the first time, proposing a duty that the FSA had to approve some financing and indicating that the contract required that and that it was a condition precedent before which the 30-day escrow would not run. However, there was no financing to approve, and the reason that there was no financing to approve is a matter of record. The reattachment of liens problem prevented the trust from getting title insurance. Without title insurance, you can't put together a financing package to be approved or disapproved. So therefore, the ball again was in their court. Otherwise, they had to proceed to get the financing in order to present a package that could be approved or disapproved. To take counsel's argument at face value, if they never did anything in terms of proposing a financing package, the contract would be forever because therefore the government would have never approved or disapproved the financing and therefore the 30 days would never run. In fact, that's apparently what they're arguing now. But I think it's interesting to note that this is the first time that I'm aware that they've argued this requirement. It's always a requirement by my client, and it's always a requirement that's never been talked about before and certainly that no contemporaneous documents exist regarding. That is the case, of course, with the demand. Counsel indicated there's no evidence that, well, it was essentially approving a negative argument, but counsel indicated that there was no evidence that we failed to receive a demand or that we, I can't remember how he put it, but at any rate, the declaration of Mr. McIntyre in this case at page 35 in the excerpts of record is evidence, and it says, I never received, we never received any request that a demand be placed in escrow. That is evidence. It stands uncontroverted. Well, what's the evidence regarding request for continuance to put stuff together? Exactly. And giving all inferences to the appellant by appointment. Right. There was a request for a continuance. Mr. McIntyre declares that he consented to that request. There's a notation as indicated by the court, TC, telephone call, and so forth. The issue is never raised again by the appellant. In other words, the appellant never says, oh, by the way, why didn't you give me that two-week continuance? They weren't shy about complaining when we didn't do things that they thought we should be doing, if you look at the correspondence here. If they had sent us, and in fact, there were consequences for our failure to give the continuance, and I believe it was that they would proceed to appeal with further litigation and so forth, which they didn't do. Another indication that, in fact, the continuance was granted. But nothing happened. They said they needed the continuance not for any reason of allowing us to approve financing or anything like that. They said they needed the continuance to solve a problem that they were having, that they were having that was preventing this from being consummated, and that was this reattachment of liens problem. They said, Chicago Title is saying we've got this problem with reattachment of liens. I don't understand their position, but give us two weeks. We think we can get it worked out. Well, the two weeks were given. Nothing more was heard from them about this problem for all intents and purposes for years, I believe, for about four years. So what was the government doing in the meanwhile that just sort of went to the back of the desk? Well, this particular agency, I believe, is pretty busy with transactions like this, and indeed with other transactions involving this particular party. But I take it the ball was left in the appellant's court. They said we've got a problem with reattachment of liens. We can't get our title insurance. It's elementary. It's, you know, to get the financing to proceed to close the escrow, you have to get this ALTA title insurance policy. Okay, so the last that McIntyre hears, as I understand it, is that we've got this issue with reattachment of liens. We need a couple of weeks. And then it goes off his screen for how many years? Four years? Apparently. Okay, four years. And so instead of when your file comes back up on Tickler or whatever it did, back on the screen, whatever, the government doesn't call them and say, what's going on? Why haven't you acted? They just cancel the contract. Well, they didn't cancel it. Well, under two possible scenarios or theories of when this contract would have ended, one is after the expressly requested 14-day continuance expired, and the other would be by operation of law that in any contract for the sale of real property, a reasonable time to complete the sale would be implied. In either event, in 1998, they did write and say, look, it's been this long. Nothing has happened. And? And yes, the contract has expired. It wasn't canceled, but it expired. The time to do what the trust needed to do has long since passed. What was the government doing with the property in the meantime? Well, holding it, as I understand it. So they had a willing buyer, and they just sort of let it go away. Your Honor. My trouble is, you know, we're batting this back and forth, and they had two parties to a land sales agreement, and then the government loses it off its screen and then gets it back up, and the next thing you know, four years after the last activity, people are scrambling around. They can't find the documents. The key guy is no longer around. So on the Comparis family side, can't testify personally. So why wouldn't this have been something where the issue should have been that the government had some duty to put it back on and trigger it so that they then knew that they were going to be in default? Your Honor, the appellant in this case wished to purchase property from an inventory of presumably many such properties. They were given that opportunity, and they were given that opportunity in writing by virtue of a contract. You can lead a horse to water, so to speak. We attempted to – we told them, look, it's been a while. I mean, what you say happened later actually happened earlier. In other words, we said the contract was signed in 92, and 94, consistent with what the court would have expected us to do, we said, look, 30 days, come on, let's do it. And they were engaged. Excuse me? And they were engaged. Yes, they did, and they then started complaining about the terms of the contract. But when they got over that, they said, okay, we'll do it, apparently. And then a problem that they had that we couldn't influence, which was the reattachment of liens by a prior first and priority lender came up. They were unable, per everything we can see in the correspondence, to resolve that problem, and that problem was not going to go away. So what's your answer to the question then, under the contract, did or did you not at that point have any obligation before declaring the contract expired? Did the government have any obligation to go back to the buyer and get a status report before it declared the contract expired? In other words, that you were clean, the ball was clearly in their court, there was no contractual duty of the seller in that case to do anything. I don't believe so, Your Honor. I think that this contract expired in and of itself, and it expired after a fairly lengthy period of time in a course of conduct between these parties that indicated definitively in the end, I would suggest, that the plaintiff was unable to perform, and that was something that we couldn't control. In other words, if they never, for example, talk about the four-year gap, whatever, if at some point during that time they had come back and said, well, I know you only gave us two weeks, but it has been a year, but we've got this resolved now. And then we said, ah, too late, we're canceling. That would have been a much different scenario than what we have now. What we have now is never at any point, including this day, any indication that they were able to perform this contract. All right. Thank you. Let me briefly touch on a couple of issues. How did you address that issue? In other words, you guys went radio silent. They were radio silent. What was going on for four years, and if your client was so hot to get the property, why didn't they call the government up and say, okay, we're ready? It wasn't radio silent. Eric Contreras' declaration, I was just now looking for this, for that four-year period, the memory slip, whatever we want to call it, they were acting as caretaker for this property. The FSA met with them regularly on this piece of property. They asked Contreras for help with evicting one of the clients, excuse me, tenants that was on that property. So there wasn't a lack of communication. But no money. Beg your pardon? No money. I'm not. No money. They never came up with any money to buy it. That's another red herring brought up by the opposing counsel, was this issue of getting alternative financing. That's the first time I've heard of this issue, because the contract itself says the government's going to provide the financing. As far as that goes, we're back to this question of the $35,000 check, because that would have been the duty of Contreras would be to tender that check, and the credit sale would have been closed. But we know that the government never asked for financials or approved a credit sale. The reattachment of liens is also a red herring. It's under California state law. There's a one-year period in which it can reattach. And by the time the government had given Contreras this contract, about 18 months after they had signed it, years after they had acquired the property, it simply is a non sequitur. It doesn't matter, because the year had run. It was the title company that was having problems with the reattachment issue. As a matter of law, I don't believe Contreras ever had a problem with that issue. And it was certainly never communicated by the government that this was an issue that precluded financing. So your argument, then, is in this four-year period that counsel for the government cited, Contreras was actually in contact with the government, not evidencing any abandonment. And your problem is that the only proof you have of that is Eric's hearsay declaration. That's correct, Your Honor. Thank you. Thank you. Counsel, the case argued is submitted. We appreciate counsel's argument. We'll take our ten-minute recess.
judges: Gibson , Fisher, Callahan